**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PHASERX, INC.,[1] | Case No. 17-12890 (CSS) |
| Debtor. | |

**DECLARATION OF ROBERT W. OVERELL, PH.D., PRESIDENT AND CHIEF
EXECUTIVE OFFICER OF PHASERX, INC., IN SUPPORT OF CHAPTER 11
PETITION AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, Robert W. Overell, Ph.D., declares as follows under the penalty of perjury:

1.     I am the President, Chief Executive Officer, and Chief Accounting Officer of PhaseRx, Inc., a Delaware corporation (the "**Debtor**"), the debtor and debtor in possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtor.

2.     I have served as the Debtor's President and Board member since 2006 and as Chief Executive Officer of the Debtor since 2009. In my role as President and CEO of PhaseRx, I am responsible for overseeing the operations and financial activities of the Debtor, including but not limited to, monitoring cash flow, managing the sale transaction process, managing staff and consultants, and financial planning. As a result of my tenure with the Debtor, my review of public and non-public documents, and my discussions with other members of the Debtor's management team, I am generally familiar with the Debtor's business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees or retained advisers that report to me in the ordinary

---

[1] The Debtor's last four digits of its U.S. federal tax identification number are 0620. The address for the Debtor's headquarters is 410 West Harrison Street, Suite 300, Seattle, Washington 98119.

course of my responsibilities. I am authorized by the Debtor to submit this First Day Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On November 27, 2017 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtor will continue to operate its business and manage its properties as a debtor in possession.

5.      I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for relief that was filed under chapter 11 of the Bankruptcy Code (the "**Bankruptcy Code**") and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2] The Debtor seeks the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Case on its business. I have reviewed the Debtor's petition and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business and to successfully maximize the value of the Debtor's estate.

6.      This First Day Declaration (i) provides an overview of the Debtor's businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtor's financial performance and the events leading to the Debtor's chapter 11 filings, and (ii) sets forth the relevant facts in support of the First Day Pleadings.

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

60838137.5

## I.    COMPANY AND BUSINESS OVERVIEW

### A.    Overview of Business Operations

7.    PhaseRx, Inc. ("**PhaseRx**" or the "**Company**") is a biopharmaceutical company incorporated in the State of Delaware on March 9, 2006 and is located in Seattle, Washington. The Company's founding polymer technology enables the delivery of nucleic acid such as RNA (ribose nucleic acid) and other therapeutics inside cells. The initial focus of the Company was on a family of therapeutics termed "siRNAs" (small interfering RNAs), and a program was developed to treat liver cancer. Due to a failure of the selected drug target to have a therapeutic effect in an animal model of liver cancer, this program was terminated. Since 2013, the Company has been focused on the development of mRNA (messenger RNA) therapeutics. PhaseRx is now developing a portfolio of mRNA products for the treatment of inherited enzyme deficiencies in the liver using intracellular enzyme replacement therapy, or i-ERT, and expects the lead drug candidate to generate clinical safety and efficacy data in 2019. PhaseRx is not aware of any other enzyme replacement therapies for intracellular enzyme deficiencies currently being marketed for inherited enzyme deficiencies in the liver, and believes that the commercial potential for i-ERT is completely untapped and similar to the large and growing >$4 billion worldwide market for conventional ERT, which includes drugs such as Cerezyme.  PhaseRx's i-ERT approach is enabled by its proprietary Hybrid mRNA Technology platform, which allows synthesis of the missing enzyme inside the cell. Its initial product portfolio targets the three urea cycle disorders ornithine transcarbamylase deficiency ("**OTCD**"), argininosuccinate lyase deficiency ("**ASL deficiency**"), and argininosuccinate synthetase deficiency ("**ASS1 deficiency**").

8.    PhaseRx has preclinical proofs of concept in two mouse models of the urea cycle disorders showing significant reductions in the level of blood ammonia, which it believes is an approvable endpoint by the Food & Drug Administration ("**FDA**") for the demonstration of

3

efficacy in human clinical trials of the urea cycle disorders. PhaseRx is not aware of any other ERT products on the market to treat these diseases, because the urea cycle reaction occurs inside the cell and is inaccessible to the administered enzyme. In contrast, PhaseRx expects delivery of the missing enzyme using i-ERT with its Hybrid mRNA Technology to be a promising approach to treat these patients. Beyond the urea cycle disorders, PhaseRx believes there are a significant number of inherited disorders of metabolism in the liver that are candidates for its therapeutic approach and that its Hybrid mRNA Technology can be adapted to develop mRNA therapeutics for the treatment of other inherited liver disorders using its platform.

9.      PhaseRx's i-ERT approach is accomplished by delivering normal copies of the mRNA that make the missing enzyme inside the liver cell, thereby enabling proper physiological function and correcting the disease. A key challenge with mRNA therapeutics historically has been their satisfactory delivery into the patients' cells. PhaseRx believes that its Hybrid mRNA Technology addresses these difficulties and enables synthesis of the desired protein in the hepatocyte, which is the chief functional cell type in the liver harboring the metabolic cycles that need to be corrected in metabolic liver diseases. PhaseRx believes its technology is superior to alternative technologies because, based upon peer-reviewed journal articles and presentations of its competitors and its internal preclinical studies, it results in high-level synthesis of the desired protein in the hepatocyte, has better tolerability and can be repeat-dosed with a good safety profile and without loss of effectiveness, thus enabling treatment of chronic conditions.

10.     As noted above, PhaseRx's initial focus is on urea cycle disorders, which are a group of rare genetic diseases generally characterized by the body's inability to remove ammonia from the blood. The urea cycle consists of several enzymes, including OTC, ASL and ASS1. Since the urea cycle reactions occur inside the cell, conventional ERT does not work as a

4

treatment for these disorders. Urea cycle disorders are caused by a genetic mutation that results in a deficiency of one of the enzymes of the urea cycle that is responsible for removing ammonia from the bloodstream, causing elevated levels of ammonia in the blood. The elevated ammonia then reaches the brain through the circulation, where it causes cumulative and irreversible neurological damage, and can result in coma and death. While currently marketed ammonia scavengers such as Ravicti (glycerol phenylbutyrate) and Buphenyl (sodium phenylbutyrate) provide palliative care of the symptoms, liver transplant is the only currently available cure for urea cycle disorders. PhaseRx's goal is to treat the urea cycle disorders by intravenous delivery of mRNA that makes the relevant missing urea cycle enzyme inside the cell, thus reinstating control of blood ammonia. PhaseRx believes that anticipated improvements in newborn screening and the availability of corrective therapy will lead to improved diagnosis and survival rates among patients with urea cycle disorders.

11.    PhaseRx has three therapeutic urea cycle disorder programs under development: (i) PRX-OTC to treat OTCD, (ii) PRX-ASL to treat ASL deficiency, and (iii) PRX-ASS1 to treat ASS1 deficiency. Preclinical efficacy has been established for PRX-OTC with two biological measures, including normalization of the level of ammonia in the blood. In June 2016, PhaseRx selected PRX-OTC as its lead product candidate and demonstrated preclinical proof of concept for the treatment of a second product candidate, PRX-ASL. In 2016, PhaseRx initiated scale up of the manufacturing of PRX-OTC, and in November 2016, PhaseRx announced positive safety results from its single escalating dose response study in non-human primates using its Hybrid mRNA Technology. In November 2016, PRX-OTC received orphan drug designation from the FDA. With continued funding of the program, PhaseRx expects that IND-enabling studies would be initiated in the first half of 2018, that manufacturing clinical supplies of the lead urea cycle

5

disorder product candidate consistent with current good manufacturing practices, or cGMP, would be completed in the in the second half of 2018, and that filing of an IND application with the FDA would occur in the fourth quarter of 2018 or early 2019. This would enable Phase 2a single-dose and Phase 2b repeat-dose clinical proof of concept studies in OTCD patients to be conducted, which would be expected to generate Phase 2a safety and efficacy data in the first half of 2019 and Phase 2b safety and efficacy data in the second half of 2019, including measurement of reduction in blood ammonia.

12.    On September 20, 2017, PhaseRx announced that it had received orphan drug designation from the FDA for its second drug candidate, PRX-ASL, for the treatment of argininosuccinate lyase deficiency.   On November 28, 2017, PhaseRx announced that the European Medicines Agency's ("**EMA**") Committee for Orphan Medicinal Products ("**COMP**") had issued a positive opinion recommending orphan medicinal product (orphan drug) designation for PRX-ASL.

### B.    Financial Overview of Business

13.    To date, PhaseRx's operations have been funded primarily through the sale of its common stock in the initial public offering ("**IPO**"), debt financing, a series of private placements of convertible preferred stock, and issuance of convertible notes and warrants. From its inception through December 31, 2016, PhaseRx raised an aggregate amount of approximately $69.6 million to fund its operations, of which approximately (a) $16.5 million, net of $2.0 million in costs, was from its IPO in May 2016, (b) $25.7 million was from the issuance of preferred stock, (c) approximately $20.2 million was from the issuance of convertible notes and warrants, and (d) $5.7 million, net of $307,000 in costs, from a secured term loan from Hercules.

In addition, PhaseRx received a $1.5 million upfront fee from Synageva BioPharma Corp. ("**Synageva**"), in 2014 pursuant to a collaboration and development agreement with Synageva.

### C.    Operating Losses

14.    Since its inception, PhaseRx has incurred significant operating losses. Its net losses were $20.1 million and $7.4 million for the years ended December 31, 2016 and 2015, respectively. As of December 31, 2016, PhaseRx had an accumulated deficit of $69.5 million. PhaseRx expects to continue to incur significant expenses and operating losses over the next several years.

### D.    Revenue

15.    PhaseRx currently does not have any products approved for sale in any jurisdiction and has not generated any revenue from product sales.

### E.    Research and Development Expenses

16.    PhaseRx research and development expenses consist primarily of costs incurred for its research activities, including its drug discovery efforts, and the development of its product candidates. On May 2, 2016, Debtor issued an original issue discount promissory note in the aggregate amount of $440,000 payable to a lender in exchange for a $400,000 loan. The note was repaid after the closing of the IPO.

### F.    General and Administrative Expenses

17.    General and administrative expenses consist primarily of salaries and related benefits, including stock-based compensation, related to its executive, finance and support functions. Other general and administrative expenses include allocated facility related costs, professional fees for auditing, tax, investor relations, legal services, and travel expenses.

G. **Interest Expense**

18.    Interest expense consists primarily of cash and non-cash interest expense related to the Company's convertible notes and term loans.

H. **Convertible Loan – Bridge Loan Financing – December 2015 Loan and Security Agreement**

19.    On December 11, 2015, PhaseRx issued a promissory note to Titan Multi-Strategy Fund LTD. ("**Titan**") in exchange for $500,000. On December 21, 2015, PhaseRx entered into a loan and security agreement with 17 investors, which was subsequently amended on April 6, 2016, pursuant to which Titan converted its note and certain investors made new term loans to PhaseRx in the aggregate principal amount of $4.0 million. The term loans closed on December 21, 2015, and PhaseRx received from the escrow agent net proceeds of approximately $3.2 million, after deducting certain fees and expenses. Interest accrued on the term loans at the rate of 5% per annum. The entire outstanding principal amount of the term loans together with all accrued and unpaid interest thereon converted into shares of PhaseRx's common stock upon the closing of its IPO.

I. **Convertible Promissory Notes**

20.    Prior to 2016, PhaseRx issued to investors, including beneficial owners of more than 5% of its capital stock, convertible promissory notes, in the aggregate principal amount of $16.2 million and seven-year warrants to purchase shares of the same class and series of capital stock into which the notes convert. The notes carried interest at a rate of 8% per annum. On December 11, 2015, the noteholders agreed that for purposes of calculating the number of conversion shares, the notes ceased accruing interest as of December 31, 2015. The accrued interest payable on convertible notes payable totaled $3.2 million as of December 31, 2015. Immediately prior to the consummation of the IPO, the convertible notes and unpaid accrued

interest thereon were converted into 2,788,880 shares of PhaseRx's common stock, and the seven-year warrants to purchase 2,452,242 shares of preferred stock with an exercise price of $0.01 were exercised on a cashless basis to purchase 303,096 shares of PhaseRx's common stock. Warrants to purchase 1,049,999 shares of preferred stock with an exercise price of $1.00 expired upon the IPO.

### J.    Investor Loan and Security Agreement

21.    On December 21, 2015, PhaseRx entered into a loan and security agreement with 17 investors, pursuant to which these investors made term loans to PhaseRx in the aggregate principal amount of $4.0 million. Interest accrued on the term loans at the rate of 5% per annum. The entire outstanding principal balance of $4.0 million of the term loans together with all accrued and unpaid interest of $86,000 were converted into 1,021,525 shares of PhaseRx's common stock upon the closing of its IPO, at a conversion price equal to 80% of the IPO offering price. The value of the beneficial conversion feature of $1.0 million was recorded as a discount with an offsetting credit to additional paid-in capital. The discount was fully amortized to interest expense on the conversion date.

### K.    Discount Promissory Note

22.    On May 2, 2016, PhaseRx issued an original issue discount promissory note in the aggregate amount of $440,000 payable to a lender in exchange for a $400,000 loan. The note was repaid after the closing of the IPO.

### L.    Initial Public Offering

23.    In May 2016, PhaseRx completed its initial public offering ("**IPO**") and sold 3,700,000 shares of common stock at a price of $5.00 per share to the public. The shares began trading on The NASDAQ Capital Market on May 18, 2016. The aggregate net proceeds received by PhaseRx from the IPO, net of underwriting discounts and commissions and offering expenses,

9

was $16.5 million. Immediately prior to the pricing of the IPO, all then outstanding shares of PhaseRx's convertible preferred stock, convertible notes and loans were converted into 7,040,380 shares of common stock and warrants were exercised by cashless exercise to purchase 303,096 shares of common stock. The related carrying value of shares of preferred stock, notes and warrants in the aggregate amount of $51.6 million was reclassified as common stock and additional paid-in capital. Additionally, PhaseRx amended and restated its certificate of incorporation, effective May 17, 2016 to, among other things, change the authorized number of shares of common stock to 50,000,000 and the authorized number of shares of preferred stock to 5,000,000.

### M.    Hercules Loan – June 2016 Loan and Security Agreement

24.    On June 7, 2016, PhaseRx entered into a loan and security agreement by and among PhaseRx (as the same has been and may be amended, restated, supplemented or otherwise modified from time to time, the "**LSA**," together with all other loan documents, security instruments, and other documents related to, referenced in, or executed in connection with the LSA, the "**Prepetition Loan Documents**"), the several banks and other financial institutions or entities from time-to-time parties to the loan and security agreement and Hercules Capital, Inc. ("**Hercules**"), in its capacity as administrative agent for itself and the lenders, pursuant to which the lenders agreed to make a term loan available to PhaseRx for working capital and general business purposes, in a principal amount of up to $8 million (the "**Hercules Loan**"). On June 7, 2016, the lenders funded $6 million of the term loan, and PhaseRx received $5.7 million, net of issuance costs. The draw period for an additional $2 million as set forth in the loan and security agreement expired on December 15, 2016.

25.    The Hercules Loan bears interest at a floating annual rate equal to the greater of (i) 9.25% and (ii) the sum of (a) 9.25%, plus (b) the prime rate as reported by The Wall Street

10

Journal minus 3.50%, resulting in a rate of 9.50% as of December 31, 2016. As of the Petition Date, the interest rate has increased to 10%. PhaseRx is required to make interest payments in cash on the first business day of each month, beginning on July 1, 2016. The Term Loan began amortizing on July 3, 2017, in equal monthly installments of principal and interest, with such payments beginning on July 3, 2017, and continuing on the first business day of each month thereafter until the Term Loan is repaid. The final maturity date of the Term Loan is December 2, 2019. Upon repayment of the term loan, PhaseRx is also required to pay an end of term charge to the Lenders equal to 5.85% of the aggregate original principal amount of all Term Loan advances extended by the Lenders to PhaseRx.

26.     As of the Petition Date, the Debtor was indebted and liable to the Prepetition Secured Party, without defense, counterclaim or offset of any kind, in the aggregate amount of not less than (i) $5,156,007.53, plus (ii) any accrued and unpaid interest with respect thereto, indemnification obligations, fees, costs, and expenses (collectively, the "**Prepetition Secured Obligations**").  To secure the Prepetition Secured Obligations and pursuant to the Prepetition Loan Documents, the Debtor granted to Hercules security interests and liens on substantially all of the Debtor's assets.

**N.     Liquidity and Capital Resources**

27.     From inception to December 31, 2016, PhaseRx has incurred an accumulated deficit of $69.5 million. It has financed its operations since inception primarily with (i) the net proceeds of approximately $16.5 million from the sale of its common stock in its IPO in May 2016, (ii) the net proceeds of $5.7 million from Hercules, (iii) $25.7 million from the sales of shares of its convertible preferred stock, and (iv) $20.2 million from the issuance of convertible notes and warrants.

28.     As of the Petition Date, the Debtor has $1,760,925 of cash and cash equivalents.

## II.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

29.    PhaseRx has limited cash availability, and needs additional capital to fund its operations.  Given the limited options remaining, on October 13, 2017, its Board of Directors (the "**Board**") retained an investment banker, Cowen, to market the company for a sale of substantially all of its assets.  Upon its retention, Cowen immediately began building on the substantial prior interactions that the Company had had with potential business development partners, commenced a prepetition marketing process, and assisted in the development of a data room and teaser in order to comprehensively market the company.  PhaseRx has received significant interest during the process, which led to several parties entering into non-disclosure agreements and conducting due diligence.

30.    On October 26, 2017, PhaseRx received a delisting notice from Nasdaq, which informed them that, absent an appeal, trading in PhaseRx's common stock would be suspended from Nasdaq at the opening of business on November 1, 2017. PhaseRx appealed the decision to a Nasdaq Hearing Panel, which will stay the suspension of its securities, pending the panel's decision subsequent to the hearing on December 7, 2017.

31.    With restricted availability to cash, the Board met on November 10, 2017 and made the determination that the most efficient way to maximize value for all creditor constituencies could be to file for protection under chapter 11 of the Bankruptcy Code and seek to sell substantially all of the Debtor's assets under section 363 of the Bankruptcy Code, and since then the Debtor duly made preparations for this Chapter 11 Case.

## III.    363 SALE

32.    PhaseRx intends to sell substantially all of its assets in the Chapter 11 Case to the highest and best bidder.  Hercules has agreed to allow its cash collateral to be used to fund the

Chapter 11 Case and the 363 sale.  However, given its lack of liquidity, PhaseRx needs to complete the 363 sale process as expeditiously as possible.

## IV.    FIRST DAY PLEADINGS

33.    In furtherance of the objective of a value-maximizing reorganization of the Debtor, the Debtor seeks approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully requests that the Court consider entering the Proposed Orders granting such First Day Pleadings. For the avoidance of doubt, the Debtor seeks authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

34.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtor to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to its business or loss of productivity or value and (b) constitutes a critical element in the Debtor's ability to successfully maximize value for the benefit of its estate.

**A.**    ***Motion of Debtor for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 345, 363, and 364, Fed. R. Bankr. P. 6003, and Del. Bankr. L.R. 2015-2 and 4001-3 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Authorizing Continuation of Existing Deposit Practices (the "Cash Management Motion")***

35.    In the Cash Management Motion, the Debtor seeks entry of interim and final orders, pursuant to sections 105(a), 345, 363, and 364 of the Bankruptcy Code, (i) authorizing, but not directing, the Debtor to continue to maintain and use its existing cash management system, including maintenance of existing bank and investment accounts, checks, and business

forms; (ii) granting the Debtor a waiver of certain bank account and related requirements of the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") to the extent that such requirements are inconsistent with the Debtor's practices under its existing cash management system or other actions described in the Cash Management Motion; and (iii) authorizing, but not directing, the Debtor to continue to maintain and use its existing deposit practices. The Debtor also requests that the Court authorize and direct all banks with which the Debtor maintains accounts to continue to maintain, service, and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtor.

      1.      The Debtor's Cash Management System and the Bank Accounts

36.      In the ordinary course of its business, the Debtor maintains a cash management system (the "**Cash Management System**") that is integral to the operation and administration of its business. The Cash Management System allows the Debtor to (i) monitor and control all of the Debtor's cash receipts and disbursements, (ii) identify the cash requirements of the Debtor, and (iii) transfer cash as needed to respond to the cash requirements of the Debtor.

37.      The Cash Management System is managed by the Debtor at its headquarters in Seattle, Washington, where it oversees the administration of the various bank accounts to effectuate the collection, disbursement, and movement of cash. Its oversight facilitates accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from the Debtor Bank Accounts (as defined below).

38.      As of the Petition Date, the Debtor maintains a primary depository operating account, a depository account, and a securities account (collectively, the "**Debtor Bank Accounts**") in the United States. Specifically, the Debtor Bank Accounts are located at (a)

Silicon Valley Bank in the United States (primary operating account and depository account), and (b) U.S. Bank National Association in the United States (securities account).

39.    A schedule of the Debtor Bank Accounts is annexed to the Cash Management Motion as Schedule 1.[3] As reflected in Schedule 1, each of the Debtor Bank Accounts is held in the name of Debtor.

40.    The Debtor typically only has outflows.  To the extent that funds are received, they are deposited into the operating account at Silicon Valley Bank ("**SVB**").  All operating disbursements are made from the SVB operating account via check, wire, or ACH.  To the extent that funds are transferred between the Debtor Bank Accounts, the Debtor requests the wire transfer from U.S. Bank National Association ("**US Bank**" and collectively with SVB, the "**Banks**") to SVB, with a copy to the investment manager, Capital Advisors Group, and the account manager.

41.    The SVB operating account is covered by an Account Control Agreement with Hercules Capital, Inc. as the agent.

42.    The US Bank security account is covered by an Account Control Agreement with Capital Advisors Group, Inc. and Hercules Capital, Inc. as the agent.

    2.    Continued Use of the Debtor's Cash Management System and the Debtor Bank Accounts

43.    I believe that the Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtor's business operations during the Chapter 11 Case and its goal of maximizing value for the benefit of all parties in interest. To require the Debtor to adopt a new cash management system at this early

---

[3] The Debtor believes, and has undertaken reasonable efforts to ensure, that Schedule 1 lists all of the bank and investment accounts that comprise the Debtor's Cash Management System. In the event that any bank or investment account has been inadvertently omitted from Schedule 1, the Debtor requests that the relief sought by the Cash Management Motion be deemed to apply to such account.

and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtor's ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtor to address its cash management requirements and the Debtor Bank Accounts are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**"). Accordingly, the Debtor requests that it be allowed to maintain and continue to use the Cash Management System, including maintenance of its existing Debtor Bank Accounts.

44.     As part of the relief requested herein, and to ensure that its transition into chapter 11 is as smooth as possible, the Debtor seeks an order authorizing the Debtor to (i) maintain and continue to use the Debtor Bank Accounts, including but not limited to those accounts listed on Schedule 1, in the same manner and with the same account numbers, styles, and document forms as are currently employed; (ii) receive or deposit funds in and withdraw funds from the Debtor Bank Accounts in the ordinary course by all usual means, including checks, wire transfers, drafts, and electronic fund transfers or other items presented, issued, or drawn on the Debtor Bank Accounts; (iii) pay ordinary course bank fees in connection with the Debtor Bank Accounts, including prepetition fees; (iv) perform its obligations under the documents and agreements governing the Debtor Bank Accounts; and (v) for all purposes, treat the Debtor Bank Accounts as accounts of the Debtor in its capacity as a debtor in possession.

45.     If the relief requested herein is granted, I have been informed that the Debtor will implement appropriate mechanisms to ensure that no payments will be made on any debts

16

incurred by the Debtor prior to the Petition Date, other than those authorized by this Court.[4] To prevent the possible inadvertent payment of prepetition claims against the Debtor, except those otherwise authorized by the Court, the Debtor will work closely with SVB to ensure appropriate procedures are in place to prevent checks issued by the Debtor prepetition from being honored absent this Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to the Debtor's prepetition obligations.

46.     To the extent that SVB honors a prepetition check or other item drawn on the account (i) at the direction of the Debtor to honor such prepetition check or item, or (ii) in a good faith belief that the Court has authorized such prepetition check or item to be honored, the Debtor requests that SVB not be held liable to the Debtor or to its estate on account of such prepetition check or other item being honored postpetition. The Debtor believes that such flexibility is necessary to induce SVB to continue providing cash management services to the Debtor.

47.     Additionally, within fifteen (15) days of the date of entry of an interim or final order granting this Motion, the Debtor will (i) contact SVB and US Bank, (ii) provide SVB and US Bank with the Debtor's employer identification number, and (iii) identify the accounts held at SVB and US Bank as held by a debtor in possession in a bankruptcy case.

48.     In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of the Chapter 11 Case, the Debtor requests that SVB and US Bank be authorized and directed to continue to administer, service, and maintain the Debtor Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course, and, when requested by the Debtor in its sole

---

[4] The Debtor has sought authority to pay certain of their prepetition obligations in various motions filed contemporaneously herewith.

discretion, to honor any and all checks, drafts, wires, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Accounts on account of a claim against the Debtor arising on or after the Petition Date.

49.     The Debtor further requests that it be authorized to implement such reasonable changes to the Cash Management System as the Debtor may deem necessary or appropriate, including, without limitation, closing any of the Debtor Bank Accounts and opening any additional bank accounts following the Petition Date (the "**New Accounts**") wherever the Debtor deems that such accounts are needed or appropriate and whether or not the banks in which the accounts are opened are designated approved depositories in the District of Delaware. Notwithstanding the foregoing, any New Accounts that the Debtor opens will be at banks that have executed a Uniform Depository Agreement with the U.S. Trustee, or at such banks that are willing to immediately execute such an agreement, and any New Account that the Debtor opens in the United States will be (a) with a bank that is organized under the laws of the United States of America or any state therein and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (b) designated a "Debtor in Possession" account by the relevant bank. The Debtor requests that the relief sought by this Motion extend to any New Accounts and that any order approving this Motion provide that the New Accounts are deemed to be Debtor Bank Accounts that are similarly subject to the rights, obligations, and relief granted in such order. The Debtor will provide the U.S. Trustee with prompt notice of any Debtor Bank Accounts that it closes or New Accounts that it opens. In furtherance of the foregoing, the Debtor also requests that the relevant banks be authorized to honor the Debtor's requests to open or close (as the case may be) such Debtor Bank Account(s) or New Account(s).

    3.     Continued Use of the Debtor's Existing Checks and Business Forms

50.    To minimize expenses to its estate, the Debtor seeks authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's status as a debtor in possession; provided, however, that in the event the Debtor generates new checks during the pendency of the Chapter 11 Case other than from its existing stock of checks, such checks will include a legend referring to the Debtor as a "Debtor in Possession." The Debtor also seeks authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtor's status as a debtor in possession.[5]

51.    I believe that changing the Debtor's existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtor's estate. Further, such changes would disrupt the Debtor's business operations and would not confer any benefit upon parties that deal with the Debtor. For these reasons, the Debtor requests that it be authorized to use its existing check stock, correspondence, and other business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

### 4.    Waiver of Certain Requirements of the U.S. Trustee

52.    The Debtor further requests, pursuant to sections 105(a) and 363 of the Bankruptcy Code, that this Court grant a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with (i) the Debtor's existing practices under the Cash Management System or (ii) any action taken by the Debtor in accordance with any order granting this Motion or any other order entered in the Chapter 11 Case. To supervise the administration of chapter 11 cases, the U.S. Trustee has established

---

[5] Although the operating guidelines established for a debtor in possession by the U.S. Trustee would require the Debtor to obtain and use new checks bearing the "Debtor in Possession" designation, the Debtor does not believe that such guidelines impose any limitation on the Debtor's other correspondence and business forms. Nevertheless, out of an abundance of caution, the Debtor seeks explicit authority to continue using its existing correspondence and business forms without reference to the Debtor's status as a debtor in possession.

certain operating guidelines for debtors in possession. These requirements (the "**UST Requirements**") require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; and (iii) maintain a separate debtor in possession account for cash collateral.

53.    The Debtor seeks a waiver of the UST Requirements that it close the Debtor Bank Accounts and open new postpetition bank accounts.  If enforced in this Chapter 11 Case, such requirements would disrupt the Debtor's business, causing delays in payments to vendors, administrative creditors, employees, and others, thereby impeding the Debtor's efforts through the bankruptcy.  As described above, the Debtor Bank Accounts are central to the Debtor's Cash Management System, which the Debtor needs to maintain smooth disbursements in the ordinary course of business.  Disrupting the Cash Management System would serve no legitimate or rehabilitative purpose and would be destructive to the Debtor's value as a going concern.

54.    Further, it would be unnecessary and inefficient to require the Debtor to abide by the UST Requirement to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to such accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtor's payroll and other tax obligations. The creation of new debtor in possession accounts designated solely for tax obligations would be unnecessarily burdensome.

55.    In addition, it is unnecessary to require the Debtor to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral. As set forth in the Debtor's motion for authority to use cash collateral, the Debtor has provided significant safeguards to ensure that parties with security interests in the Debtor's cash collateral are

20

adequately protected and that such parties have been provided with notice of the proposed use of such cash collateral.

5.   <u>Continued Deposit Practices</u>

56.   As part of the Cash Management System, the Debtor may deposit funds into the Debtor Bank Accounts (the "**Deposit Practices**"). The Debtor requests (i) authorization to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtor may implement to the Cash Management System, and (ii) a waiver of the deposit requirements of section 345(b) of the Bankruptcy Code, on an interim basis, to the extent that such requirements are inconsistent with the Deposit Practices. For the avoidance of doubt, the Debtor hereby seeks authorization to continue to deposit funds into the Debtor Bank Accounts in accordance with existing practices, notwithstanding the requirements of section 345(b) of the Bankruptcy Code.

**B.     *Motion of Debtor for Order Under 11 U.S.C. §§ 105(a), 363(b), 506(a), 507(a)(8), and 541 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Taxes and Fees (the "Tax Motion")***

57.   In the Tax Motion, the Debtor seeks entry of an order, substantially in the form of order attached to the Tax Motion, pursuant to sections 105(a), 363(b), 506(a), 507(a)(8), and 541 of the Bankruptcy Code and Bankruptcy Rule 6003, authorizing it to pay, in its sole discretion, but subject to the terms and provisions of any cash collateral and/or postpetition financing agreement made by the Debtor or order entered by the Court, any prepetition tax and fee obligations including, without limitation, use taxes; franchise taxes; personal property taxes; any other types of taxes, fees, or similar charges; and any penalty, interest, or similar charges in respect of such taxes (collectively, the "**Taxes and Fees**") owing to those state, provincial, and local governmental entities in the United States, listed on <u>Exhibit B</u> attached to the Tax Motion (the "**Taxing Authorities**"). The Debtor is substantially current in the payment of assessed and

21

undisputed Taxes and Fees that were due and payable prior to the Petition Date. However, certain Taxes and Fees attributable to the prepetition period (the "**Prepetition Taxes**") have not yet become due, or remain outstanding, as of the Petition Date. Based on historical payments, as of the Petition Date, the Debtor estimates that it owes to the Taxing Authorities approximately $22,229 relating to Taxes and Fees accrued during the prepetition period. In an abundance of caution, the Debtor proposes to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees under this Motion to $50,000 unless further authorization is obtained from this Court.

58.    For the avoidance of doubt, it is my understanding that the requested authorization (i) would be discretionary, allowing the Debtor, among other things, to elect to pay Taxes and Fees as to which its officers and directors may have personal liability in the event of nonpayment by the Debtor, before other Taxes and Fees, (ii) would be without prejudice to the Debtor's rights to contest the amounts of any Taxes and Fees on any grounds it deems appropriate, and (iii) would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress, or arise from prepetition periods.

59.    In addition, the Debtor requests that the Court authorize the Debtor's banks to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid as of the Petition Date, and authorize the Debtor's banks and financial institutions to rely on the representations of the Debtor as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

60.    As set forth in the Tax Motion, it is my understanding that the Taxes and Fees at issue are appropriate for payment to the extent that they are priority or secured claims that are payable in full or, alternatively, under the personal liability theory or the doctrine of necessity. I believe that by paying the Taxes and Fees in the ordinary course of business, as and when due, the Debtor will avoid unnecessary disputes with the Taxing Authorities—and expenditures of time and money resulting from such disputes—over myriad issues that are typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

61.    Prior to the Petition Date, the Debtor incurred obligations to state, provincial, and local governmental entities in the United States. Although, as of the Petition Date, I believe the Debtor was substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may not yet have become due. It is my understanding that certain prepetition Taxes and Fees may not be due until the applicable monthly, quarterly, or annual payment dates—in some cases immediately and in others not until next year. I have been informed that through October 31, 2017, the Debtor paid approximately $301,840 on account of Taxes and Fees.

62.    I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtor's estate, thereby promoting its prospects for a successful chapter 11 process. It is my understanding that, if such obligations are not timely paid, the Debtor will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations.

63.    Moreover, I have been advised that certain of the Taxes and Fees may be considered to be obligations as to which the Debtor's officers and directors may be held directly or personally liable in the event of nonpayment. In such events, I believe that collection efforts

60838137.5

by the Taxing Authorities would provide obvious distractions to the Debtor and its officers and directors in their efforts to bring the Chapter 11 Case to an expeditious conclusion.

64.    I have been informed that certain of the Taxing Authorities may not have been paid or may have been sent checks and/or fund transfers for Taxes and Fees that may or may not have been presented or cleared as of the Petition Date. Similarly, in other cases, Taxes and Fees have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable and, thus, any checks or fund transfers will be issued on a postpetition basis. Accordingly, the Debtor seeks entry of an order authorizing and directing its banks and other financial institutions to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers issued by the Debtor to the Taxing Authorities in payment of Taxes and Fees that had not been honored and paid as of the Petition Date, and authorizing the Debtor's banks and financial institutions to rely on the representations of the Debtor as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

**C.     *Motion of Debtor for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "Cash Collateral Motion")***

65.    In the Cash Collateral Motion, the Debtor requests (a) authorization to use Cash Collateral as provided therein; (b) authorization to provide adequate protection as specified therein to Hercules on account of the Debtor's use of the Cash Collateral and any diminution in value of Hercules' interest in the Prepetition Collateral; (c) the vacation and modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order; (d) the scheduling of a final hearing to consider entry of a final order granting the relief requested in the Cash Collateral

Motion on a final basis, and to approve the form and manner of notice with respect to the final hearing; and (e) granting related relief.

66.    If the Cash Collateral Motion is not approved and the Debtor does not obtain authorization to use the Cash Collateral, I believe that the Debtor will suffer immediate and irreparable harm. Without the use of the Cash Collateral, the Debtor will not have the liquidity to conduct its business as a going concern. The Debtor urgently needs funds to make payroll, capital expenditures, and other expenditures that are critical to its continued viability and ability to reorganize its capital structure or conduct a sale of all, or substantially all, of its assets as a going concern.

67.    As described above, it is vital to the success of the Debtor's sale efforts that it immediately obtains access to Cash Collateral. The preservation of the Debtor's business and the Debtor's ability to conduct a sale successfully depend heavily upon the expeditious approval of the use of Cash Collateral for general working capital purposes. Absent this Court's approval of the interim relief sought herein, the Debtor faces a substantial risk of severe disruption to its business operations and irreparable damage to its relationships with its vendors.

68.    The Debtor's request for use of Cash Collateral is limited to budgeted expenses reasonably calculated to maximize the value of the Debtor's assets and the realization on the Prepetition Collateral.

69.    The Debtor has an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, and seeks to use all Cash Collateral existing on or after the Petition Date. The Debtor needs the Cash Collateral to pay operating expenses all in accordance with the Budget. Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with damaging consequences for the Debtor and its estate and creditors.

70.     The Debtor has prepared a budget, a copy of which is attached to the Cash Collateral Motion as <u>Exhibit A</u> (the "**Budget**"), which shows, *inter alia*, the Debtor's forecasted disbursements from the Petition Date through January 29, 2017. Under the Budget, the Debtor intends to use Cash Collateral, among other things, (i) to pay (a) payroll expenses, (b) postpetition trade amounts, and (c) various prepetition claims paid in the ordinary course that are the subject of other motions filed concurrently herewith, as authorized by the Court; (ii) as working capital; (iii) to fund critical business operations conducted by the Debtor; and (iv) for other general corporate purposes.

71.     Absent the entry of an Order permitting the Debtor to use Cash Collateral to pay disbursements under the Budget, the Debtor will have insufficient funds available to operate its businesses, administer the Chapter 11 Case, and sell its assets as a going concern.

72.     The Debtor believes that the terms and conditions of its use of the Cash Collateral (including the provision of adequate protection described herein) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Therefore, the Debtor submits that it should be authorized to use the Cash Collateral on the terms set forth in the Budget.

73.     The Debtor has limited cash availability to fund its operations and sell substantially all of its assets as a going concern. As of the Petition Date, the Debtor had $1,760,925 of cash and cash equivalents.

74.     A substantial amount of the Debtor's assets are purportedly encumbered under the Prepetition Loan Documents. Therefore, it would be impossible to operate the Debtor's business and administer the Chapter 11 Case absent authorization to use the Cash Collateral. Unless this Court authorizes the use of the Cash Collateral, the Debtor's operations would likely cease,

resulting in adverse effects on the value of the Debtor's estate to the severe detriment to all stakeholders. Particularly harmed would be the employees of the Debtor, whose employment would be terminated in the event the Debtor is unable to use the Cash Collateral.

75.     As described above, the Debtor has an urgent and immediate need for cash in order to maintain business relationships, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs and otherwise finance its operations.

76.     For the foregoing reasons, I believe that authorization to use Cash Collateral is in the best interest of the Debtor, its estates, its creditors, and other parties in interest.

**D.      *Motion of Debtor for Interim and Final Orders (A) Prohibiting Providers from Altering, Refusing or Discontinuing Service; (B) Approving the Debtor's Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "Utilities Motion")***

77.     In the Utilities Motion, the Debtor requests entry of interim and final orders, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting the Utility Providers from (i) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtor on account of any outstanding amounts for services rendered prepetition or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (b) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtor; and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

78.     In conjunction with its day-to-day operations, the Debtor receives traditional utility services from various utility providers (each, a "**Utility Provider**" and collectively, the "**Utility Providers**") for, among other things, telephone services, internet services, conference call services, and office phones, and other similar services (collectively, the "**Utility Services**").

The Utility Providers include, without limitation, the entities set forth on the list annexed to the Utilities Motion as Exhibit C (the "**Utility Providers List**").

79.     I have been informed that the Debtor paid an average of approximately $1,827.18 per month on account of all Utility Services during 2017.

80.     I believe that the Debtor's receipt of uninterrupted Utility Services is vital to the Debtor's continued business operations and, consequently, to the success of this Chapter 11 Case. Therefore, I believe that the relief requested in the Utilities Motion is necessary and in the best interests of the Debtor, its estates, and its creditors.

E.     ***Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (B) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (C) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition, (D) Authorizing Payment of Withholding and Payroll-Related Taxes, (E) Authorizing Payment of Workers' Compensation Obligations, and (F) Authorizing Payment of Prepetition Claims Owing to Administrators and Third-Party Providers (the "Employee Wage and Benefits Motion")***

81.     In the Employee Wage and Benefits Motion, the Debtor requests entry of interim and final orders, authorizing, but not directing, the Debtor, in its sole discretion, to (a) pay prepetition claims and/or honor obligations incurred or related to the Compensation Obligations, the Withholding Obligations, the Incentive Programs, Vacation Time, Sick Leave, bereavement leave, the Reimbursable Expense Obligations, the Employee Benefits Obligations, Workers' Compensation Claims, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (including the Administrative Fee Obligations) (collectively, the "**Employee Obligations**") and (b) maintain, continue, and honor, in the ordinary course of business, the Incentive Programs, Vacation Time, Sick Leave, bereavement leave, and holiday

pay policies, postpetition Reimbursable Expense Obligations, the Employee Benefits Plans, and Workers' Compensation Insurance (collectively, the "**Employee Plans and Programs**").

82.     As of the Petition Date, the Debtor currently employs approximately 7 full-time and 4 part-time employees (the "**Employees**"), all of whom work at the Debtor's headquarters in Seattle, Washington.

83.     The Employees are vital for the Debtor's business, and their value cannot be overstated. To a significant extent, the Debtor's success depends upon its ability to attract and retain qualified personnel. The loss of certain Employees could impede the Debtor's short-term objectives and seriously harm its ability to successfully implement its business strategy. Furthermore, replacing Employees can be difficult for the Debtor given the limited number of individuals in its industry with the breadth of skills and experience required.

84.     If the Debtor cannot assure its Employees that they will promptly pay prepetition Employee Obligations (as defined below) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations (as defined below), certain Employees will likely seek employment elsewhere, potentially with the Debtor's competitors. The loss of Employees at this critical juncture would have a material adverse impact on the Debtor's business and ability to maximize value through the administration of the Chapter 11 Case.

85.     The Debtor also utilizes the services of consultants (collectively, the "**Consultants**", and, together with the Employees, the "**Workforce**") to provide a variety of services. The Consultants fill certain critical and immediate business needs of the Debtor and allow the Debtor to have a flexible workforce to meet its operational needs in a cost-effective manner. In such capacity, the Consultants fill several types of roles for the Debtor, including

29

providing temporary administrative, accounting, consulting, and support services, as needed. The Consultants are a reliable and cost-efficient component of the Debtor's operations. Thus, as with the Debtor's regular Employees, if the Debtor fails to honor its prepetition compensation obligations to the Consultants, it is likely that the Debtor will lose such individuals' valuable services to the detriment of the Debtor's ongoing business operations.

86.     I believe that if the Debtor is unable to satisfy the Employee Obligations, Employee morale and loyalty will suffer at a time when Employee support is critical. Furthermore, in the absence of such payments, I believe that the Employees may seek alternative employment opportunities, perhaps with the Debtor's competitors. Such a development would deplete the Workforce and likely diminish creditor and counterparty confidence in the Debtor. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtor must focus on sustaining its operations. Accordingly, I believe that the Debtor must be able to pursue all reasonable measures to retain the Employees by, among other things, continuing to honor wages, benefits, and related obligations, including those that accrued prior to the Petition Date, as set forth in the Employee Wage and Benefits Motion.

87.     Accordingly, for the reasons set forth herein and expanded on in the Employee Wage and Benefits Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Employee Wage and Benefits Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in this Chapter 11 Cases with minimal disruption, thereby maximizing value for the estate.

F.      ***Application of Debtor for Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent (the "156(c) Application")***

88.      In the 156(c) Application, the Debtor requests entry of an order appointing Donlin, Recano & Company, Inc. ("**Donlin Recano**") as the Claims and Noticing Agent for the Debtor and its Chapter 11 Case, including assuming full responsibility for the distribution of notices and the maintenance, and processing and docketing of proofs of claim filed in the Chapter 11 Case. It is my understanding that the Debtor's selection of Donlin Recano to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtor has obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, I submit that, based on all engagement proposals obtained and reviewed, that Donlin Recano's rates are competitive and reasonable given Donlin Recano's quality of services and expertise.

89.      Although the Debtor has not yet filed its Schedules and Statements (defined below), it anticipates that there will be in excess of 200 entities to be noticed. In view of the number of anticipated claimants and the limited Debtor workforce available to handle the administrative noticing tasks, the Debtor submits that the appointment of a claims and noticing agent is appropriate and in the best interests of both the Debtor's estate and its creditors.

G.      ***Motion of Debtor for Entry of an Order Extending Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules Extension Motion")***

90.      In the Schedules Extension Motion, the Debtor requests entry of an order extending the deadline by which the Debtor must file required its (a) schedules of assets and liabilities, (b) schedules of executory contracts and unexpired leases, and (c) statements of financial affairs (collectively, the "**Schedules and Statements**") by fifteen (15) days, from 14

31

days, the date such Schedules and Statements are otherwise required to be filed, to 29 days from the Petition Date.

91.     The amount of work entailed in completing the Schedules and Statements, the substantial burdens already imposed on management by the commencement of the Chapter 11 Case, the limited number of employees available to collect the required information, the competing demands upon such employees, and the time and attention the Debtor must devote to the restructuring process, the Debtor respectfully submits that "cause" exists to extend the deadline by an additional fifteen (15) days, through and including January 9, 2018.

92.     While the Debtor less than 200 creditors, the Debtor submits that under the circumstances of the Chapter 11 Case, good and sufficient cause exists to extend the deadline to file the Schedules and Statements.

## II.    CONCLUSION

93.     The Debtor's ultimate goal in this Chapter 11 Case is the maximization of estate value through a marketing and sales process. In the near term, however, the Debtor's immediate objective is to maintain as its business during the early stages of this Chapter 11 Case, with as little interruption or disruption to the Debtor's operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and a sale of substantially all of the Debtor's assets will be substantially enhanced.

94.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

32

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of December, 2017.

**PhaseRx, Inc.**
Debtor and Debtor in Possession

*/s/ Robert W. Overell*

_____
Robert W. Overell, Ph.D.
President and Chief Executive Officer

33