# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

PHASERX, INC.,[1]

        Debtor.

Chapter 11

Case No. 17-12890 (CSS)

## MOTION OF THE DEBTOR FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (C) SCHEDULING AN AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTOR AND THE SUCCESSFUL BIDDER, (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (D) GRANTING RELATED RELIEF

PhaseRx, Inc., as a debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**") hereby moves this Court (this "**Motion**") for the entry of an order pursuant to sections 105(a), 363 and 365 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the "**Local Rules**") for an order (i)(a) approving procedures in connection with the sale of substantially all of the Assets (as that term is defined below) of the Debtor; (b) scheduling the related auction and hearing to consider approval of the sale; (c) approving procedures related to the assumption of certain of the Debtor's executory contracts and unexpired leases; (d) approving the form and

---

[1] The Debtor's last four digits of its U.S. federal tax identification number are 0620. The address for the Debtor's headquarters is 410 West Harrison Street, Suite 300, Seattle, Washington 98119.

manner of notice thereof; and (e) granting related relief; and (ii)(a) approving asset purchase agreement between the Debtor and a successful bidder; (b) authorizing the sale of the subject assets free and clear of liens, claims, encumbrances, and other interests; (c) approving the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases related thereto; and (d) granting related relief, and respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, date February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution. The Debtor confirms its consent, pursuant to Rule 9013-1(f) of the Local Rules, to the entry of a final order by this Court in connection with this Motion. Venue is proper in this District pursuant to 28 U.S.C. § 1408. The statutory predicates for the relief requested in this Motion are Bankruptcy Code §§ 105(a), 363, 365, 503(b), and 507(a)(2); Bankruptcy Rules 2002, 6004, and 6006(a); and Local Rules 2002-1, 6004-1, and 9013-1(m).

## BACKGROUND

### I.    The Debtor's Chapter 11 Case

2.      On December 11, 2017 (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court commencing a case for relief (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").

3.      Information regarding the Debtor's business, capital structure, and the circumstances leading to this chapter 11 filing is set forth in the *Declaration of Robert W. Overell, Ph.D., President and Chief Executive Officer of PhaseRx, Inc., in Support of Chapter 11*

*Petition and First Day Pleadings*, which was filed concurrently herewith (the "**Overell Declaration**").

4.      The Debtor continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested in the Chapter 11 Case, and no committees have yet been appointed.

## II.      Hercules Loan – June 2016 Loan and Security Agreement

5.      On June 7, 2016, the Debtor entered into a loan and security agreement by and among the Debtor (as the same has been and may be amended, restated, supplemented, or otherwise modified from time to time, the "**LSA**," together with all other loan documents, security instruments, and other documents related to, referenced in, or executed in connection with the LSA, the "**Prepetition Loan Documents**"), the several banks and other financial institutions or entities from time-to-time parties to the loan and security agreement and Hercules Capital, Inc. ("**Hercules**"), in its capacity as administrative agent for itself and the lenders, pursuant to which the lenders agreed to make a term loan available to the Debtor for working capital and general business purposes, in a principal amount of up to $8 million (the "**Hercules Loan**"). On June 7, 2016, Hercules funded $6 million of the term loan, and the Debtor received $5.7 million, net of issuance costs. The draw period for an additional $2 million as set forth in the loan and security agreement expired on December 15, 2016.

6.      The Hercules Loan bears interest at a floating annual rate equal to the greater of (i) 9.25% and (ii) the sum of (a) 9.25%, plus (b) the prime rate as reported by The Wall Street Journal minus 3.50%, resulting in a rate of 9.50% as of December 31, 2016. As of the Petition Date, the interest rate has increased to 10%. The Debtor is required to make interest payments in cash on the first business day of each month, beginning on July 1, 2016. The Term Loan began

amortizing on July 3, 2017, in equal monthly installments of principal and interest, with such payments beginning on July 3, 2017, and continuing on the first business day of each month thereafter until the Term Loan is repaid. The final maturity date of the Term Loan is December 2, 2019. In addition to an early payment charge, upon repayment of the term loan, the Debtor is also required to pay an end of term charge to the Lenders equal to 5.85% of the aggregate original principal amount of all Term Loan advances extended by Hercules to the Lender.

7.      As of the Petition Date, the Debtor was indebted and liable to Hercules, without defense, counterclaim or offset of any kind, in the aggregate amount of not less than (i) $5,156,007.53, plus (ii) any accrued and unpaid interest with respect thereto, indemnification obligations, fees, costs, and expenses (collectively, the "**Prepetition Secured Obligations**").  To secure the Prepetition Secured Obligations and pursuant to the Prepetition Loan Documents, the Debtor granted to Hercules security interests and liens on substantially all of the Debtor's assets. The Debtor has stipulated to the extent, validity, first priority and nonavoidability of the liens and claims of Hercules in a Cash Collateral Stipulation and has filed a motion to approve such Stipulation on an interim and final basis.

8.      The Debtor has limited cash availability, and needs additional capital to fund its operations. As of the Petition Date, the Debtor has $1,760,925 of cash and cash equivalents. Given the limited options remaining, on October 13, 2017, the Debtor's Board of Directors (the "**Board**") retained an investment banker, Cowen, to market the company for a sale of substantially all of its assets.  Upon its retention, Cowen immediately began building on the substantial prior interactions that the Debtor had had with potential business development partners, commenced a prepetition marketing process, and assisted in the development and management of a data room and teaser in order to comprehensively market the company.  The

Debtor has received significant interest during the prepetition marketing process, which led to several parties entering into non-disclosure agreements and conducting due diligence, including several meetings with the Debtor's management.

9.    With restricted availability to cash, the Board met on November 10, 2017 and made the determination that the most expeditious and efficient way to maximize value for all creditor constituencies could be to file for protection under chapter 11 of the Bankruptcy Code and seek to sell substantially all of the Debtor's assets under section 363 of the Bankruptcy Code, and since then the Debtor duly made preparations for this Chapter 11 Case.

10.    Despite these comprehensive marketing efforts by Cowen, at this point in time, although significant interest has been expressed, no party has provided the Debtor with a definitive letter of intent or asset purchase agreement.  Given the Debtor's precarious liquidity and the need to shepherd parties to a rapid conclusion of the process, the Debtor, with the consent of Hercules, files this Motion in order to entice further interest in the sale of substantially all of its assets.

11.    The Debtor intends to sell substantially all of its assets in the Chapter 11 Case and Hercules has agreed to allow its cash collateral to be used to fund the Chapter 11 Case and the 363 sale.  However, given its lack of liquidity, the Debtor needs to complete the 363 sale process as expeditiously as possible.

## RELIEF REQUESTED

12.    By this Motion, the Debtor seeks entry of an order, substantially in the form attached hereto as Exhibit A (the "**Bidding Procedures Order**"):

    (a)    authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1 in connection with the sale of substantially all of the Debtor's assets (the "**Assets**");

(b)    approving the form and manner of notice attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "**Sale Notice**") of an auction (the "**Auction**") and sale hearing (the "**Sale Hearing**") with respect to the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (the "**Sale**");

(c)    scheduling the Auction and Sale Hearing;

(d)    approving procedures for the assumption and assignment (as set forth in the Bidding Procedures Order, the "**Assumption Procedures**") of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "**Contracts**") and

(e)    granting related relief.

13.    The Debtor and its professionals will market the Assets prior to the Auction, in the manner set forth in the Bidding Procedures Order.  During this marketing process, the Debtor reserves the right, subject to consultation with Hercules, to enter into a Stalking Horse agreement (the "**Stalking Horse Agreement**") with a bidder if the Debtor believes that such an agreement will further the purposes of the Auction by, among other things, enticing value-maximizing bids. Accordingly, the Debtor requests authority, in the exercise of its reasonable business judgment and after consultation with Hercules, to offer a Stalking Horse bidder (the "**Stalking Horse Bidder**") any or all of the following as part of a Stalking Horse Agreement:

(a)    a break-up fee (the "**Break-Up Fee**") in an amount to be determined by the Debtor, not to exceed 3 percent of the total purchase price offered by the Stalking Horse Bidder in the Stalking Horse Agreement;

(b)    reimbursement of the Stalking Horse Bidder's reasonable and actual fees and expenses incurred as the Stalking Horse Bidder up to $250,000 (the "**Expense Reimbursement**");

(c)    initial overbid protection in the amount of $100,000 (the "**Initial Overbid**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Bid Protections**").

14.     The Debtor also requests that, to the extent the Debtor enters into a Stalking Horse Agreement, any Break-Up Fee and/or Expense Reimbursement be granted administrative expense priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

15.     Furthermore, the Debtor will seek entry of an order at the conclusion of the Sale Hearing, substantially in the form attached hereto as Exhibit B (the "**Sale Order**"):

> (a)     authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Successful Bid;
>
> (b)     authorizing and approving the Sale of all or substantially all of the Assets free and clear of liens, claims, encumbrances, and other interests, all in accordance with the Successful Bid; and
>
> (c)     authorizing the assumption and assignment of the Contracts; and granting any related relief.

16.     The Debtor reserves the right to file and serve any supplemental pleading or declaration that the Debtor deems appropriate or necessary in its reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of its request for entry of the Sale Order before the Sale Hearing.

**THE DEBTOR'S SALE EFFORTS**

17.     As set forth in the Overell Declaration, Hercules was unwilling to lend any further amounts to the Debtor under the circumstances.  Moreover, Hercules was not willing to allow the Debtor to further use its cash collateral without reasonable certainty of a sale process being conducted pursuant to Bankruptcy Court approved bidding procedures under section 363 of the Bankruptcy Code.  Therefore, one of the conditions to the Debtor's use of cash collateral is the immediate pursuit of an expedited sale process.

18.     As part of the proposed sale process, the Debtor, and its professionals, will continue to engage in the robust marketing effort for the Debtor's assets which started well

before the Petition Date, continuing to contact both financial and strategic investors regarding a potential sale process, including all parties contacted prior to the commencement of the case. There will be no conditions on potentially interested parties regarding bid levels, structure, financing, or management in connection with the solicitation of indications of interest.  All interested parties will be given an opportunity to execute a confidentiality agreement and be given access to the data room maintained by Cowen.  Those parties that execute a confidentially agreement will be provided with substantial due diligence information concerning, and access to, the Debtor, including, without limitation, presentations by the Debtor and its advisors, and access to financial, operational, and other detailed information.

## **THE PROPOSED SALE**

19.    The Debtor believes a prompt sale of the Assets represents the best option available to maximize value for all stakeholders in this Chapter 11 Case.  Moreover, it is critical for the Debtor to execute on a sale transaction as expeditiously as possible as the Debtor is utilizing Hercules' cash collateral in order to conduct this sale process.  The Debtor only has enough cash on hand to operate through January 26, 2017.  Therefore, time is of the essence.

20.    By this Motion, the Debtor requests that the Court approve the following general timeline, with the assumption that the Bankruptcy Court will enter an order granting this motion on shortened notice.  These dates are subject to change in the event that the Bankruptcy Court does not enter an order at that hearing:

(a)    ***Contract Cure Objection Deadline***: Objections to the potential assumption and assignment of any Contract will be filed and served no later than **January 19, 2018** at 4:00 p.m. (prevailing Eastern Time) (the "**Cure or Assignment Objection**").

(b)    ***Bid Deadline***: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, if one has been accepted by the Debtor as contemplated by the Bidding Procedures Order, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as

defined in the Bidding Procedures) must be received by no later than **January 22, 2018** at 6:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**").

(c)     *Auction*: The Auction, if necessary, will be held at the offices of Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 on **January 24, 2018** at 10:00 a.m. (prevailing Eastern Time), or such other location as identified by the Debtor after notice to all Qualified Bidders.

(d)     *Sale Objection Deadline*: Objections to the Sale will be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on **January 19, 2018**.

(e)     *Sale Hearing*: Consistent with the Court's availability and schedule, the Sale Hearing will commence on or before **January 26, 2018**.

21.     The Debtor believes that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing the bankruptcy estate.  To further ensure that the Debtor's proposed Auction and Sale process maximizes value for the benefit of the Debtor's estate, the Debtor and its professionals will use the time following entry of the Bidding Procedures Order to actively market the Assets in an attempt to solicit the highest or otherwise best bids available.  The Debtor believes the relief requested by this Motion is in the best interests of its creditors, its other stakeholders, and all other parties in interest, and should be approved.

## THE BIDDING PROCEDURES ORDER

**I.     The Bidding Procedures**

22.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtor has developed and proposed the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order.  The Bidding Procedures were developed to permit an expedited sale process, to promote participation and active bidding, and to ensure that the Debtor receives the highest or otherwise best offer for the Assets.  Given the terms and conditions of the Debtor's use of cash collateral, the Debtor believes that the timeline for

consummating the sale process established pursuant to the Bidding Procedures is in the best interest of its estate and all parties in interest.

23.    The Bidding Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, the criteria for selecting a successful bidder, and the ability of the Debtor to select a Stalking Horse Bidder and to award certain Bid Protections if the Debtor believes, in the exercise of its business judgment, that selecting a Stalking Horse Bidder and awarding Bid Protections will enhance the Debtor's efforts to maximize the value of the Assets.

24.    The following summary describes the salient points of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[2]

(a)    **Qualification of Bidders (Local Bankr. R. 6004-1(c)(i)(A)).**  To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "**Bid**"), and each party submitting such a Bid (each, a "**Bidder**"), must be determined by the Debtor to satisfy each of the following conditions:

(i)    **Corporate Authority.**  Written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the Sale; *provided, however*, that, if the Bidder is an entity specially formed for the purpose of effectuating the Sale, then the Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Sale by the equity holder(s) of such Bidder.  *See* Bidding Procedures § III(C)(3).

(ii)    **Proof of Financial Ability to Perform.**  Written evidence that the Debtor reasonably concludes demonstrates that the Bidder has the necessary financial ability to close the Sale and provide adequate assurance of future performance under all Assigned Contracts.  Such information should include, inter alia, the following:

---

[2]    This summary of the Bidding Procedures is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

- contact names, email addresses and telephone numbers for verification of financing sources;

- evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Sale;

- the Bidder's current financial statements (audited if they exist); and

- any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such Bidder has the ability to close the Sale; *provided, however*, that the Debtor shall determine, in its sole discretion, in consultation with Hercules, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

*See* Bidding Procedures § III(C)(4).

(b)    **Qualified Bids (Local Bankr. R. 6004-1(c)(i)(B)).**  Each Bid must be determined by the Debtor to satisfy each of the following conditions:

(i)    **Good Faith Deposit.**  Each Bid must be accompanied by a deposit paid in cash or by wire transfer in immediately available funds, into an interest bearing escrow account to be identified and established by the Debtor in an amount equal to ten percent (10%) of the proposed purchase price, (the "**Good Faith Deposit**").  *See* Bidding Procedures § III(C)(1).

(ii)    **Terms.**  A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Sale (the "**Transaction Documents**").  A Bid should propose a Sale involving substantially all of the Debtor's Assets.   The Debtor shall evaluate all Bids to determine whether such Bid(s) maximizes the value of the Debtor's estate as a whole.  The Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtor that the Bidder wishes to have assumed and assigned to it (collectively, the "**Assigned Contracts**").  The Debtor will consider proposals for less than substantially all of the Debtor's assets or operations.   A bid to purchase only certain assets of the Debtor shall include a purchase price determined by such bidder but shall be reviewed by the Debtor in consultation with Hercules to evaluate the sufficiency of the purchase price.  *See* Bidding Procedures § III(C)(2).

(iii)    **Contingencies.**  A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but

may be subject to the accuracy in all material respects at the closing of specified representations and warranties. *See* Bidding Procedures § III(C)(5).

(iv) **Irrevocable.** A Bid must be irrevocable until the closing of the Auction; *provided, however,* that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined in the Bidding Procedures), such bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures. *See* Bidding Procedures § III(C)(6).

(v) **Disclaimer of Fees.** Each Bid (other than a Stalking Horse Bid, if any) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, except as the Debtor may agree with a Stalking Horse Bidder pursuant to the Bidding Procedures Order. By submitting its Bid, each bidder is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including pursuant to section 503(b) of the Bankruptcy Code. *See* Bidding Procedures § III(C)(7)

(vi) **Bid Deadline.** The Debtor must receive a Bid in writing, on or before the Bid Deadline, **January 22, 2018 at 6:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtor. *See* Bidding Procedures § III(C)(8).

(c) **Right to Credit Bid (Local Bankr. R. 6004-1(b)(iv)(N))**. Hercules shall be deemed to be a Qualified Bidder and is not required to make any Good Faith Deposit nor submit a bid by the Bid Deadline. Hercules may participate in the Auction and credit bid at any time up to the conclusion of the Auction, in its sole and absolute discretion, any portion and up to the entire amount of the Hercules' respective claims at any time, on any individual Asset, portion of the Assets, or all Assets constituting its respective claims in conjunction with any sale of the Debtor's assets, including the right to credit bid for the Debtor's intellectual property (the "**Credit Bid**"). Upon exercise of a Credit Bid, Hercules shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual Asset, portion of the Assets, or all of the Assets, and Hercules shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid. Except for the holders of any Permitted Exceptions (as defined in the Cash Collateral Order), no other person may credit bid unless the entire amount of Hercules' claims will be indefeasibly paid in full in cash on the closing of the proposed sale. In the event Hercules exercises the Credit Bid, and the amount of the Credit Bid of Hercules

exceeds the total amount of the highest bids for the Assets subject to the Credit Bid, such Credit Bid will be deemed the highest and best bid and such Credit Bid will be accepted by the Debtor and be presented for approval to the Bankruptcy Court. Hercules will not be a Backup Bidder unless it consents in writing otherwise.

Subject to the prior paragraph, the Stalking Horse Bidder shall have the right (including as part of any Overbid) to credit bid all or a portion of its Bid Protections (if any) pursuant to section 363(k) of the Bankruptcy Code.

*See Bidding Procedures § IV(D); Bidding Procedures Order ¶¶ 10 and 11.*

(d)    **Cancelation of the Auction.** If the Debtor does not receive a Qualified Bid (other than the Credit Bid) or otherwise determines not to proceed with the Auction, the Debtor may elect, upon consultation with Hercules, not to conduct the Auction and may cancel the Auction. If the Debtor has received only the Credit Bid, the Debtor may declare the Credit Bid the Successful Bid without conducting the Auction. *See* Bidding Procedures § IV.

(e)    **Bidding Increments and Overbid (Local Bankr. R. 6004-1(c)(i)(C)).** At the Auction, the Debtor will announce the leading Qualified Bid (the "**Auction Baseline Bid**"). Bidding on the Assets beyond the Auction Baseline Bid will be done in increments of $100,000 (the "**Minimum Overbid Increment**"); *provided* that the Debtor shall retain the right to modify the bid increment requirements at the Auction. Additional consideration may include cash, the assumption of debt or marketable securities, a credit bid under section 363(k) of the Bankruptcy Code of an allowed secured claim, other consideration as the Debtor may permit and value in its sole discretion, or any combination thereof. *See* Bidding Procedures § IV(B)(1).

(f)    **Backup Bidder (Local Bankr. R. 6004-1(c)(i)(C)).** Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid(s) at the Auction (other than a Credit Bid submitted by Hercules), as determined by the Debtor, in the exercise of its business judgment, shall be required to serve as a backup bidder (the "**Backup Bidder**"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more overbids at the Auction, its final overbid) (the "**Backup Bid**") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is twenty five (25) days after entry of the Sale Order (the "**Outside Backup Date**") or the closing of the transaction with the Successful Bidder. Following entry of the Sale Order, if the Successful Bidder fails to consummate an approved transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtor may designate the Backup Bidder to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's

deposit, if any, shall be forfeited to the Debtor's estate, and the Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder. The closing date to consummate the transaction with the Backup Bidder shall be no later than the later of twenty five (25) days after the date that the Debtor provides notice to the Backup Bidder that the Successful Bidder failed to consummate a Sale and that the Debtor desires to consummate the transaction with the Backup Bidder or five (5) calendar days after necessary regulatory approvals are completed by the Backup Bidder and/or the Debtor. The deposit, if any, of the Backup Bidder shall be held by the Debtor until the earlier of two (2) business days after (i) the closing of the Sale with the Successful Bidder or (b) the Outside Backup Date; *provided, however*, that in the event the Successful Bidder does not consummate the transaction as described above and the Debtor provides notice to the Backup Bidder, the Backup Bidder's deposit shall be held until the closing of the transaction with the Backup Bidder. In the event that the Debtor fails to consummate a transaction with the Backup Bidder as described above, the Backup Bidder's deposit shall be forfeited to the Debtor's estate, and the Debtor specifically reserves the right to seek all available damages from the defaulting Backup Bidder. *See* Bidding Procedures § IV(D).

(g)     **Diligence Materials and Data Room.**  Any person or entity that wishes to conduct due diligence with respect to the Assets (the "**Diligence Materials**") must deliver to the Debtor an executed confidentiality agreement, the form of which is attached as <u>Attachment A</u> to the Bidding Procedures (it being understood that any person or entity that previously signed a confidentiality agreement in a form satisfactory to the Debtor shall not be required to execute a new confidentiality agreement). The executed confidentiality agreement must be signed and transmitted by the person or entity wishing to have access to the Debtor's data room (the "**Data Room**") and other Diligence Materials. *See* Bidding Procedures § III(B).

(h)     **Reservation of Rights (Local Bankr. R. 6004-1(c)(i)(D)).**  The Debtor reserves its rights to modify these Bidding Procedures in its reasonable business judgment in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customer terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadline set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) reopening the Auction to consider further Bids or Overbids; (d) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (*e.g.*, the amount of time to make subsequent overbids, whether a non-conforming Bid constitutes a Qualified Bid); (e) canceling the Auction; and (f) rejecting any or all Bids or Qualified Bids.

25.     Importantly, the Bidding Procedures recognize the Debtor's fiduciary obligations

to maximize the value of its assets and, as such, do not impair the Debtor's ability to consider all

qualified bid proposals.  Additionally, as noted above, the Bidding Procedures preserve the Debtor's right to modify the Bidding Procedures as necessary or appropriate to maximize value of the Debtor's estate.

## II.    The Auction and Sale.

26.    If one or more Qualified Bids are received by the Bid Deadline, the Debtor will conduct an Auction to determine the highest and best Qualified Bid.  This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the Debtor's estate, including, without limitation, the following: (a) the amount and nature of the consideration; (b) the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any; (c) the ability of the Qualified Bidder to close the proposed transaction; (d) the proposed closing date and the likelihood, extent and impact of any potential delays in closing, including delays owing to regulatory uncertainty; (e) any purchase price adjustments; (f) the impact of the transaction on any actual or potential litigation; and (g) the net after-tax consideration to be received by the Debtor's estate (collectively, the "**Bid Assessment Criteria**").  If no Qualified Bid other than the Credit Bid is received by the Bid Deadline, the Debtor may determine not to conduct the Auction and deem the Credit Bid to be the Successful Bid without conducting the Auction.  The Debtor seeks authority from the Court to schedule the Auction on a date as further described in the Bidding Procedures.

## III.    *Form and Manner of Sale Notice*

27.    On or within two business days after entry of the Bidding Procedures Order, the Debtor will cause the Sale Notice to be served on (a) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel to Hercules; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) all state and local tax authorities with

an interest in the Assets; (g) all parties known or reasonably believed to have asserted an Interest (as defined herein) in the Assets; (h) the counterparties to the Contracts (the "**Contract Counterparties**"); (i) the Securities and Exchange Commission; (j) the Debtor's insurance carriers; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.

28.    The Debtor (or its agents) shall also serve a notice in substantially the form as that appearing in Exhibit C (the "**Creditor Notice**") upon all of the parties set forth on the Debtor's creditor matrix who were not served with a Sale Notice.  Finally, the Debtor proposes to publish the notice attached hereto as Exhibit D (the "**Bidding Procedures Notice**") once in *The USA Today (National Edition)* within five business days after entry of the Bidding Procedures Order.

**IV.    Summary of the Assumption Procedures.**

29.    The Debtor is also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "**Assumption Procedures**").  Pursuant to the Bidding Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bidding Procedures Order as Exhibit 3 (the "**Cure and Possible Assumption and Assignment Notice**") and Exhibit 4 (the "**Assumption Notice**") to be sent to the applicable Contract Counterparties.  Because the Bidding Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein.  Generally, however, the Assumption Procedures: (a) outline the process by which the Debtor will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

## BASIS FOR RELIEF

I.    **The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtor's Estate and Should Be Approved.**

A.    **The Proposed Notice of the Bidding Procedures and the Sale Process Is Appropriate.**

30.    The Debtor seeks to sell substantially all of the Assets through an Auction and asset sale.  The Debtor and its advisors, led by the Debtor's investment banker, will conduct an extensive marketing process.  The Debtor will develop a list of "Contact Parties" who will receive a copy of the "Information Package" (both as defined in the Bidding Procedures).  The list of Contact Parties will encompass those parties whom the Debtor believes may be potentially interested in pursuing a Sale and whom the Debtor reasonably believes may have the financial resources to consummate such a transaction.  The Bidding Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtor's estate for the benefit of its creditors and other stakeholders.

31.    Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

32.    The Debtor respectfully submits that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one will be held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Assets; (e) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity

and priority to the Sale proceeds; and (f) notice of the proposed assumption and assignment of the Contracts to the Successful Bidder.

33.     The Debtor further submits that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Cure and Possible Assumption and Assignment Notice, and the Assumption Notice, and publication of the Bidding Procedures Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.   The Debtor further submits that the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtor's marketing process, while minimizing costs to the estate.   Accordingly, the Debtor respectfully requests that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the Bidding Procedures, Auction, Sale, or Sale Hearing is required.

**B.     The Bidding Procedures Are Appropriate and Will Maximize Value.**

34.     Bidding procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets.  *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . .  if he has an 'articulated business justification'") (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y.

1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

35.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); *Edwards*, 228 B.R. at 561.

36.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y.1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

37.    The Debtor believes that the proposed Bidding Procedures will establish the parameters under which the value of the Sale may be tested at the Auction.   The Bidding

Procedures will increase the likelihood that the Debtor will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

38.     The Debtor believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets.  The proposed Bidding Procedures will enable the Debtor to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

39.     Specifically, the proposed Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

40.     At the same time, the proposed Bidding Procedures provide the Debtor with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  Additionally, if the Debtor selects a Stalking Horse Bid, entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures that the Debtor obtains fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace.  As such, creditors of the Debtor's estate can be assured that the consideration obtained will be fair and reasonable and at or above the market.

41.     The Debtor submits that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved in this District.  *See, e.g., In re Emerald Oil, Inc.*, No. 16-10704 (KG)

(Bankr. D. Del. July 28, 2016); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015); *In re Source Home Entm't LLC*, No. 14-11553 (KG) (Bankr. D. Del. July 21, 2014); *In re Palm Harbor Homes, Inc.*, No. 10-13850 (Bank. D. Del. Jan. 6, 2011); *In re Ultimate Escapes Hldgs, LLC*, No. 10-12915 (Bankr. D. Del. Oct. 8, 2010); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009); *In re VeraSun Energy Corp.*, No. 08-12606 (Bankr. D. Del. Feb. 19, 2009); *see also In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. July 14, 2007); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007); *In re Three A's Holdings, L.L.C.*, Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006).[3]

42.     Thus, the Bidding Procedures are reasonable, appropriate, and within the Debtor's sound business judgment under the circumstances because the Bidding Procedures are designed to maximize the value to be received by the Debtor's estate.

### C.     The Overbid Increment Is Appropriate.

43.     One important component of the proposed Bidding Procedures is the "Overbid" provision.  Once the Debtor determines the Auction Baseline Bid and holds the Auction, all subsequent Overbids must be made in increments of at least $100,000 more than the Auction Baseline Bid (the "**Initial Minimum Overbid**") and then continue in minimum increments of at least $100,000; provided that the Debtor shall retain the right to modify the bid increment requirements at the Auction.

44.     The Debtor believes that such Initial Minimum Overbid is reasonable under the circumstances, and will enable the Debtor to maximize the value received for the Assets while

---

[3]     Because the number of orders cited is voluminous, individual orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtor's proposed counsel.

limiting any chilling effect in the marketing process.  The Overbid increment is also well within

the increment level previously approved by courts in this District.  *See In re Emerald Oil, Inc.*,

No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016) (approving $500,000 bid increment); *In re*

*Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving

$750,000 increment); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr

D. Del. Apr. 20, 2007) (approving $500,000 increment); *In re Three A's Holdings, L.L.C.*, Case

No. 06-10886 (BLS) (Bankr D. Del. Sept. 7, 2006) (approving $500,000 increment).

> **D.**     **The Ability to Enter into a Stalking Horse Agreement with Bid Protections Has a Sound Business Purpose and Should Be Approved.**

45.     Pursuant to the Motion, the Debtor is seeking the pre-approval of this Court to

allow the Debtor to choose, subject to consultation with Hercules, a Stalking Horse Bidder at any

time after entry of the Bidding Procedures Order, and to offer that bidder the Bid Protections

without the need to return to court for further approval.  The Debtor believes that, in this case,

such relief is warranted to ensure the Debtor's ability to take advantage of a potentially value-

maximizing bid.  The ability of the Debtor to offer a Stalking Horse Bidder the Bid Protections is

beneficial to the Debtor's estate and creditors in that, by providing these incentives, the Debtor

will have an opportunity to induce a Potential Bidder to submit or increase its bid prior to the

Auction.  To the extent bids can be improved prior to the Auction, a higher floor is established

by the Stalking Horse Bid since any overbid will be at least equal to or greater than the Stalking

Horse Bid, plus the breakup fees and expenses, plus the bid increment.  Thus, even if a Stalking

Horse Bidder is offered the Bidding Protections and ultimately is not the Successful Bidder, the

Debtor and its estate will have benefited from the higher floor established by the improved bids.

The Debtor will exercise prudent business judgment before offering or agreeing to any of the Bid

Protections, and will only do so if such protections, in the reasonable business judgment of the

Debtor, will likely result in the result in the realization of greater value for the Debtor and its estate.

46.    Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted pursuant to section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." *Integrated Resources*, 147 B.R. at 659-60 (emphasis added).  Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking."  *995 Fifth Ave.*, 96 B.R. at 28 (quotation omitted); *see also Integrated Resources*, 147 B.R. at 660-61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

47.    As a result, courts routinely approve bid protections similar to the Bid Protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).  The Debtor believes that the allowance of the Bid Protections is in the best interests of the Debtor's estate and its creditors, as these protections will only be employed where a Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtor's estate.

48.     Any Stalking Horse Bidder will have expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that the Debtor will maintain a fiduciary out, and its bid will be subject not only to Court approval, but also to overbidding by third parties.  Any Bid Protections granted to a Stalking Horse Bidder will be negotiated in good faith and at arm's length, with significant give-and-take with respect to those Bid Protections.  The Debtor will only agree to the Bid Protections where it will ensure that the Debtor will have the benefit of the transaction with the Stalking Horse Bidder, without sacrificing the potential for interested parties to submit overbids at the Auction.

**E.     The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate.**

49.     As set forth above, the Sale contemplates the potential assumption and assignment of the Contracts to the Successful Bidder arising from the Auction, if any.  In connection with this process, the Debtor believes it is necessary to establish a process by which: (a) the Debtor and the Contract Counterparties can reconcile cure obligations, if any, in accordance with sections 105(a) and 365 of the Bankruptcy Code; and (b) such counterparties can object to the potential assumption and assignment of the Contracts and/or related cure amounts (the "**Assumption Procedures**").

50.     The Bidding Procedures specify the process by which the Debtor will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Contract Counterparties to Assigned Contracts to file and serve Cure or Assignment Objections.

51.     Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the

Bankruptcy Code, by (a) payment of the undisputed cure amount (the "**Cure Amount**") and/or (b) reserving amounts with respect to any disputed cure amounts.

52.     As set forth in the Bidding Procedures Order, the debtor also requests that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice.  *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the Motion, a creditor is deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

53.     The Debtor believes that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties of the potential assumption and assignment of its Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof.   Accordingly, the Debtor requests that the court approve the Assumption Procedure set forth in the Bidding Procedures Order.

II.    **Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estate.**

    A.    **The Sale of the Assets Should Be Authorized Pursuant to Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtor's Business Judgment.**

54.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated

business justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

55.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See Del.& Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

56.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

57.    "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill.

1995) ("The business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.") (citations omitted); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.  Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions.  *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

58.     As set forth above, the Debtor has a sound business justification for selling the Assets.  ***First***, the Debtor believes that the Sale will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone basis.  Moreover, to the extent that the Successful Bidder assumes certain of the Contracts, it will result in payment in full for a number of the Debtor's creditors.

59.     ***Second***, the sale of the Assets will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Assets.  The value of the Assets will be tested through the Auction conducted pursuant to and according to the Bidding Procedures.  Ultimately, the Successful Bid, after being subject to a "market check" in the form of the Auction and accepted by the Debtor in the exercise of its reasonable business judgment,

will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for its estate than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction"). Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

60.     Thus, the Debtor submits that the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. As such, the Debtor's determination to sell the Assets through an Auction process and subsequently to enter into the purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtor's business judgment. The Debtor will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtor requests that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtor's business judgment and is rightly authorized.

## B.     Sale Provisions Highlighted Pursuant to Local Rule 6004-1(b)(iv).[4]

61.     Pursuant to Local Rule 6004(b)(iv)(C), a sale motion must highlight any provisions pursuant to which an entity is being released or claims against any entity are being

---

[4]     If a provision of Local Rule 6004-1(b)(iv) is not discussed in this section, it means that the provisions governing the sale of the Assets do not contain a provision that triggers disclosure under that rule.

waived or otherwise satisfied.  The Sale Order provides that certain claims against the Debtor and/or Purchaser are barred or otherwise waived.  *See* Sale Order, ¶¶ 21, 22 and 25.

62.    Pursuant to Local Rule 6004(b)(iv)(E), a sale motion must highlight any deadlines for the closing of the proposed sale or deadlines that are conditions to closing the proposed transaction.  As set forth above, the Debtor is subject to the deadlines under the Cash Collateral Order, among which include the condition that this Motion be approved within 16 days of filing of this Motion and that the Sale will be consummated within 46 days after the deadline for submitting bids to participate at the Auction.

63.    Pursuant to Local Rule 6004(1)(b)(iv)(J), a sale motion must highlight whether, if the debtor proposes to sell substantially all of its assets, the debtor will retain or have reasonable access to its books and records to enable it to administer its bankruptcy case.  The proposed Sale Order provides that the Debtor shall have reasonable access to their books and records.  *See* Sale Order, ¶ 28.

64.    Pursuant to Local Rule 6004-1(b)(iv)(L), a sale motion should highlight any provision limiting the proposed purchaser's successor liability.  The proposed Sale Order provides that Purchaser shall not have any successor liability related to the Debtor or the transferred Assets.  *See* Sale Order ¶¶ DD, JJ, 25, and 26.

65.    Pursuant to Local Rule 6004-1(b)(iv)(N), a sale motion must highlight any provision by which the debtor seeks to allow credit bidding pursuant to Bankruptcy Code section 363(k).  The Bidding Procedures allow Hercules to credit bid the full amount of its obligations in connection with each round of bidding at the Auction.  *See* Bidding Procedures § IV(G).

66.    Pursuant to Local Rule 6004-1(b)(iv)(O), a sale motion must highlight any provision whereby the debtor seeks relief from the ten-day stay imposed by Bankruptcy Rule

6004(h).   As explained in further detail below, to maximize the value received for the Assets (and consistent with the Cash Collateral deadlines), the Debtor seeks to close the Transaction as soon as possible after the Sale Hearing.   Accordingly, the Debtor has requested that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).   *See* Bidding Procedures Order ¶ 29; Sale Order ¶ 27.

> **C.     Adequate and Reasonable Notice of the Sale Will Be Provided.**

67.       As described above, the Sale Notice: (a) will be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contract; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.   Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served on parties in interest.

> **D.     The Sale and Purchase Price Will Reflect a Fair-Value Transaction.**

68.       It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.   *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999).   The Debtor will continue to market the Assets and solicit offers consistent with the Bidding Procedures, including, without limitation, by providing acceptable bidders with access to the Data Room and requested information.   In this way, the number of bidders that are eligible to participate in the competitive Auction process will be maximized.   On the other hand, if the Debtor enters into a Stalking Horse Agreement and no auction is held because no auction is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

E.     **The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Section 363(f) of the Bankruptcy Code.**

69.     The Debtor further submits that it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and interests (collectively, the "**Interests**") pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Transferred Assets, as and to the extent applicable.

70.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a *bona fide* dispute; (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

71.     Section 363(f) is drafted in the disjunctive.   Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtor's sale of the Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citcorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is

written in the disjunctive; holding that the court may approve the sale "free and clear" provided that at least one of the subsections of section 363(f) of the Bankruptcy Code has been satisfied).

72.      The Debtor submits that, excluding assumed agreements, if any, the Assets may be sold free and clear of liens, claims, encumbrances, and other interests—all in accordance with at least one of the five conditions of section 363(f) of the Bankruptcy Code.  Consistent with section 363(f)(2) of the Bankruptcy Code, each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale and transfer of the Assets.  Furthermore, any party holding a valid lien against the Assets will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtor from the sale of the Assets to the Successful Bidder, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.  Accordingly, section 363(f) of the Bankruptcy Code authorizes the sale and transfer of the Assets free and clear of any such Interests.

**F.      The Assets and the Assigned Contracts Should Be Sold Free and Clear of Successor Liability.**

73.      The Sale Order provides that Purchaser shall not have any successor liability related to Seller or the Transferred Assets to the maximum extent permitted by law.  *See* Sale Order, ¶ 22.  Extensive case law establishes that claims against a winning bidder may be directed to the proceeds of a free and clear sale of property, and may not subsequently be asserted against that buyer.

74.      Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d

Cir. 2000).  In the case of *In re Trans World Airlines. Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003),

the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit

observed that while some courts have "narrowly interpreted that phrase to mean only in rem

interests in property," the trend in modern cases is towards "a more expansive reading of

'interests in property' which 'encompasses other obligations that may flow from ownership of

the property.'"  *Id.* at 289 (citing 3 Collier on Bankruptcy 363.06[1]).  As determined by the

Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case

cited approvingly and extensively by the Third Circuit in *Folger*, the scope of section 363(f) is

not limited to in rem interests.  Thus, the Third Circuit in *Folger* cited *Leckie* for the proposition

that the debtors "could sell their assets under § 363(f) free and clear of successor liability that

otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

75.     Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale takes free from successor liability resulting from pre-existing claims.  *See The

Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind.

1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest

that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v.

Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988)

(channeling of claims to proceeds consistent with intent of sale free and clear under section

363(f) of the Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D.

Wash. 1982) (transfer of property in free and clear sale was free and clear of Title VII

employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53

B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest

permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In*

*re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded from being asserted against his successor in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship)*, 189 B.R. 97, 104-05 (Bankr E D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

76.    The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against Purchaser.  Under section 363(f) of the Bankruptcy Code, Purchaser is entitled to know that the Assets are not tainted by latent claims that could be asserted against Purchaser after the proposed transaction is completed.   Absent that ruling, the value of the Assets could be severely compromised.

77.    Accordingly, consistent with the above-cited case law, the order approving the sale of the Assets should state that Purchaser is not liable as a successor under any theory of successor liability, for Interests that encumber or relate to the Assets.

**G.    The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code; and the Sale of the Assets Does Not Violate Section 363(n) of the Bankruptcy Code.**

78.     The Debtor requests that the Court find that the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

79.    Section 363(m), of the Bankruptcy Code provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

80.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchased or leased or purchased the assets in "good faith."   While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

81.     The Debtor submits that the Stalking Horse Bidder, if any, or any other Successful Bidder arising from the Auction would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[5]   ***First***, as set forth in more detail above, the consideration to be received

---

[5]   The Debtor believes that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction, if any, and the Bidding Procedures. Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtor will not choose as the Successful Bidder or the Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

by the Debtor pursuant to the Sale will be subject to a market process by virtue of Debtor's marketing efforts, led by its investment banker, and the Auction and will be substantial, fair, and reasonable. **Second**, the purchase agreement entered into by the Debtor and the Successful Bidder will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtor will be, represented by competent counsel, and any purchase agreement with a Successful Bidder will be the culmination of the Debtor's competitive market process and, if necessary, the Auction, in which all negotiations will be conducted on an arm's-length, good-faith basis. **Third**, where—as the Debtor anticipates will be the case here— there is no indication of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale to be avoided pursuant to section 363(n) of the Bankruptcy Code. Moreover, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. **Finally**, the Successful Bidder's offer will be evaluated and approved by the Debtor in consultation with its advisors and Hercules. Accordingly, the Debtor believes that the Successful Bidder and the resulting purchase agreement should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

82.      Moreover, because there will be absolutely no fraud or improper insider dealing of any kind, the Sale does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, Purchaser should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code. Accordingly, the Debtor requests that the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of section 363(m) of the

Bankruptcy Code.   The Debtor will submit evidence at the Sale Hearing to support these conclusions.

**H.     Credit Bidding Should Be Authorized Pursuant to Section 363(k) of the Bankruptcy Code.**

83.     A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest.  Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value.  *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled . . . that creditors can bid the full face value of their secured claims under section 363(k)").

84.     In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim.  *See In re Source Home Entm't, LLC*, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order approving Bidding Procedures which authorized parties with secured claims to credit bid); *In re Fisker Auto. Hldgs, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Jan. 23, 2014) (order authorizing secured creditors to exercise right under Bankruptcy Code section 363(k) to make a credit bid); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right

under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

### III.   The Assumption and Assignment of the Contracts Should Be Approved.

#### A.   The Assumption and Assignment of the Contracts Reflects the Debtor's Reasonable Business Judgment.

85.    To facilitate and effectuate the sale of the Assets, the Debtor is seeking authority to assign the Assigned Contracts to the Successful Bidder to the extent required by such Successful Bidder.

86.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  *See* 11 U.S.C. § 365(b)(1).

87.    The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

88.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access*

*Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).   A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.   *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *Network Access Solutions*, 330 B.R. at 75; *Exide Techs.*, 340 B.R. at 239.

89.   Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtor's business judgment. *First*, the Assigned Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. *Second*, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction.   *Third*, the Assigned Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in this chapter 11 case.

Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtor's business judgment.

90.    A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

91.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.),* 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd,* 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

92.    Counterparties to Assigned Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders.  Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

93.    To assist in the assumption, assignment, and sale of the Assigned Contracts, the

Debtor also requests that the Sale Order approving the sale of the Assets provide that anti-

assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the

assumption, assignment and sale of the Assigned Contracts and are deemed and found to be

unenforceable anti-assignment provisions within the meaning of section 365(f) of the

Bankruptcy Code.

94.    Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired

leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor,
> or in applicable law, that prohibits, restricts, or conditions the assignment of such contract
> or lease, the trustee may assign such contract or lease under paragraph (2) of this
> subsection . . . .

11 U.S.C. § 365(f)(1).

95.    Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates

provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired

lease.  *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F.

3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from

permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when

to do so will effectuate the purposes of section 365"), *cert. denied*, 522 U.S. 1148 (1998).

Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the

Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or

terminate the contract or lease upon a proposed assumption or assignment thereof.  *See, e.g., In

re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy

Code prohibits enforcement of any lease clause creating right to terminate lease because it is

being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions,

not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

96.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [*sic*], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer., Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## IV.    Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

97.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

98.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests that the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006).   Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

99.     To maximize the value received from the Assets, and to ensure that they are in compliance with the requirements of the Cash Collateral Order, the Debtor seeks to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtor hereby requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

100.    Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Hercules; (c) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; (d) the Internal Revenue Service; (e) the Taxing Authorities; (f) the United States Attorney for the District of Delaware; (g) the Attorney General for the state of Delaware; (h) the Securities and Exchange Commission; (i) any party that has requested notice pursuant to Bankruptcy Rule 2002; (j) counsel to the Stalking Horse Buyer; and (k) all parties entitled to notice pursuant to Local Rule 9013-1(m). The Debtor submits that, under the circumstances, no other or further notice is required.

101.    In addition, copies of the Sale Notice, the Bidding Procedures, and the Bidding Procedures Order will be served on the Notice Parties no later than one (1) business day after entry of the Bidding Procedures Order by this Court. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required. A copy of the Motion also is available on the website of the Debtor's notice and claims agent, Donlin, Recano & Company, Inc.

### **No Prior Request**

102.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court: (a) enter the Bidding Procedures Order, the form of which is attached as <u>Exhibit A</u> hereto; (b) enter the Sale Order, the form of which is attached as <u>Exhibit B</u> hereto; and (c) grant such other and further relief as is just and proper.

Dated: December 11, 2017  
      Wilmington, Delaware

Respectfully submitted,

**POLSINELLI PC**

_/s/ Christopher A. Ward_  
Christopher A. Ward (Del. Bar No. 3877)  
Shanti M. Katona (Del. Bar No. 5352)  
222 Delaware Avenue, Suite 1101  
Wilmington, Delaware 19801  
Telephone: (302) 252-0920  
Facsimile: (302) 252-0921  
cward@polsinelli.com  
skatona@polsinelli.com

_Proposed Counsel to the Debtor and Debtor in Possession_